HENRY JOHNSON

*v.*

THE JOHNSON RAILROAD SIGNAL COMPANY.

[Decided May 5th, 1898.   Filed January 4th, 1899.]

1. Where a receiver makes up an account under a special direction which necessarily includes payments made by the insolvent corporation before his appointment, and enters in his account entries of payments appearing on the corporation's ledger for which he can produce no vouchers, the fact that vouchers had been furnished originally may be established by the testimony of one of the officers of the company.

2. Where a contract is made between a patentee and a company by which the company is to prosecute all claims for infringement on the patent or for the royalties thereon, and out of the proceeds of any suit for damages or royalty to pay costs and attorney's fees incurred which were not taxable against the defendant, and pay the balance to the patentee, the costs and attorney's fees of a suit begun in equity for the infringement of the patent, which was decided adversely on the ground that the article was manufactured by the defendant upon a proper license by the patentee, may properly be deducted from the amount realized in a subsequent action at law between the receiver of the company and the same defendant to collect royalties.

3. Where a patentee of a railroad signal sold his patent to a company, and was to receive a royalty on all signals sold by the company, and he claimed under his contract the same royalty on signals subsequently manufactured by another company previously licensed by him, which royalty was collected by his assignee, the amount which he claims must bear its proportionate share of the expenses of collection. ·

4. An attorney received a note secured by a void mortgage from his client for services rendered in a suit, and receipted for it with the condition that it should be in full payment when paid.—*Held*, that his lien on the judgment was not thereby lost.

In insolvency. On petition of Henry Bezer. Exceptions to account of receiver.

*Mr. John Griffin* and *Mr. Walradt* (of New York), for the exceptant.

*Mr. William H. Corbin*, for the receiver.

PITNEY, V. C.

The petitioner claims to have a paramount interest as *cestui que trust* in a sum of money recovered by the receiver in a suit instituted by him in the federal court, and by petition called upon the receiver to account for it. The receiver, under direction of the court, did account; the petitioner excepted thereto, and a hearing was had upon those exceptions.

The circumstances were these: Mr. Bezer, the petitioner, is the irrevocable attorney in fact of one Cheeswright, of England, in whose name two certain patents were issued by the United States, in 1881, on the 26th of April and on the 10th of May respectively, for the manufacture of a certain style of railroad

signal known as the "Sykes signal." Cheeswright had, in 1881, given a power of attorney to one Yeomans to come to the United States and exploit the patents. Under that power Yeomans had given a license, subject to a royalty of £4 per signal, for the exclusive use of the patents during their life to the Union Switch and Signal Company, of Pennsylvania. The Union company and Yeomans did not account to the satisfaction of Cheeswright. On October 31st, 1889, a more comprehensive power of attorney was given by Cheeswright to Mr. Bezer, and later on—May, 1890—the power to Mr. Yeomans was specially revoked.

Bezer came to the United States, and on December 17th, 1889, entered into three separate contracts, which were of the same date and part and parcel of the same transaction, with the insolvent defendant, the Johnson Signal Company, which, apparently, was organized for the purpose of manufacturing railroad signals under the patents controlled by Cheeswright.

One of these writings recites the issuing of the patents to Cheeswright, and that he

"alleges or claims that the Union Switch and Signal Company is indebted or liable to him either for royalties for the use of the said inventions covered by said letters-patent or as damages for the infringement of the rights of the said patentee under said letters-patent, by making, using and selling to others [the right] to use the invention therein described,"

and that it is claimed by Cheeswright

"that various railroads and others in the United States of America have infringed the rights of the said Cheeswright under said letters-patent, and are liable to said Cheeswright for damages therefor."

After these recitals the agreement proceeds to

"sell, assign, grant, transfer and set over unto the Johnson Railroad Signal Company all his right, title and interest in and to the above-named letters-patent of the United States of America, and all his said claims or rights of action, of whatsoever kind, nature or character, against the said The Union Switch and Signal Company and against any and all persons, railroads, corporations or companies, &c., which have in any way accrued to or exist by and in favor of the said Cheeswright, either for royalties or for damages for the

unlawful use of the said patented inventions or appliances, or in any way, with full and irrevocable power to sue for, prosecute and collect the same at its own cost, expense and risk."

By another of the writings, the Signal company, in consideration of this assignment (and of a license also given by Bezer at the same time to it for the use of the patents, reserving a royalty of £3 per signal),

"promises and agrees to well and truly prosecute the said claim against the Union Switch and Signal Company in particular; and any other claims which the said The Johnson Railroad Signal Company may conclude to be just and collectible, and to bear the entire cost and expense of such prosecution or prosecutions and suit or suits. And it further agrees to render a true and correct account of any and all moneys collected or received in any such suit or proceeding, and out of the proceeds thereof to pay, first, the actual costs, expenses, attorney's and counsel's fees incurred which are not or may not be taxable or collected from the defendant in any such suit or proceeding, and after deducting all such necessary and proper expenses of any such suit or proceeding, to pay over to the said Henry Bezer, as the attorney of the said Cheeswright, the remaining or net proceeds of the sums collected."

In pursuance of that agreement, the Johnson Signal Company employed Mr. George W. Miller, a member of the New York bar, to bring, either in his own name, as attorney or solicitor, or in the name of some local attorney or solicitor, proper suit against the Union Switch and Signal Company, with the result that on the 14th of February, 1890, a bill in equity was filed by Mr. Miller for the Johnson Signal Company against the Union Switch and Signal Company, in the circuit court of the United States for the western district of Pennsylvania. The bill sets out the issuing of the letters-patent to Cheeswright, the assignment of them and the damages and claims for royalties mentioned in that assignment, to the complainant, and then charges that the defendant, the Union Switch Company, had been constructing, selling and using, and threatens to continue to construct, sell and put in use, upon various railroads of the United States, railroad signal apparatus substantially the same as that described under the Cheeswright patents, and that it declined to account for the same, and prays a

discovery and account for the income and profits and for an injunction. This bill seems to be the ordinary bill by a patentee for the infringement of a patent.

The Union Switch Company, by its answer, denied the title of the complainant to the Cheeswright patents, and set up a right by purchase from Cheeswright of the exclusive right of use in the United States under the patents, and that it was using the patents under such assignment from Cheeswright, without setting out the particulars of its title in that behalf. Then, by a cross-bill, it set up its title in detail under Yeomans, by an instrument in writing, dated March 21st, 1882, recorded in the patent office, and asked for a decree of the court establishing its title to the patents in the United States, and for an injunction restraining the complainant, the Johnson company, from exercising any right under its assignment made by Mr. Bezer as attorney for Cheeswright. This cross-bill was answered, and motion for injunction made in behalf of the defendant (the complainant in the cross-bill), which was denied, as reported in *51 Fed. Rep. 85*, on the ground that the power of attorney to Yeomans did not authorize him to convey the patents to the Union Switch Company.

The usual order for proofs was taken, and under it a mass of evidence, oral and documentary, was submitted.

The questions of law involved were the true construction of the power of attorney from Cheeswright to Yeomans, and of the license or grant by Yeomans to the Union company. The question of fact was as to notice to Cheeswright and his intelligent acquiescence in and affirmation of the license from Yeomans to the Union company.

This involved the taking of depositions in London, and Mr. Miller attended there for that purpose, and also argued the cause on final hearing. The result was a decree substantially in favor of the complainant, on the opinion of Acheson, circuit judge, concurred in by Buffington, district judge, as reported in *59 Fed. Rep. 20*. The decree was that the letters-patent were valid; that the assignment to the Johnson Signal Company was valid, and that thereby that company became and was the lawful owner

and assignee of the patents; that the defendant had infringed the exclusive rights of the complainant therein, and that injunction issue against the Union company restraining the further use of the patents, and that the complainant recover the profits which the Union company have received or made, or which have accrued to them since October 31st, 1889, and also damages which the complainant has sustained thereby, and it was referred to a master to take an account. The cross-bill of the Union company was dismissed, with costs.

From that decree an appeal was taken to the circuit court of appeals, where the decree was reversed, and the bill of the complainant dismissed, as reported in *61 Fed. Rep. 940*. The court of appeals differed with the court below as to the construction of the power of attorney from Cheeswright to Yeomans, and held that the Union company obtained rights which still exist under the Yeomans title, but confirmed the Johnson company's rights, viz., the right to collect all royalties which became due from the Union company for which they had not paid Yeomans prior to the revocation of his authority, and for all that accrued after the revocation of his authority. The language of the opinion in that respect is this: "Until Yeomans' authority was revoked and the defendants had knowledge of it, their settlements with him were a discharge of liability. For any moneys which may have become due since, settlements must be made with the plaintiffs. How the account stands we are not called upon to determine. The parties disagree about it, and the question is one principally of figures. If there is anything due, the courts of the state have jurisdiction and afford adequate remedy. The suit is not based on such a claim."

It would thus seem that the reversal was partly on the ground of the frame of the bill and partly on the ground of lack of jurisdiction in the federal courts; but, by a stipulation found in the printed book, it sufficiently appeared that the Johnson Signal Company was a non-resident and that the jurisdiction of the federal court was ample upon the amount involved, without regard to the character of the subject-matter of the controversy.

After the dismissal of the bill, which was some time early in

the year 1894, and on the 5th of February, 1895, the Johnson company was declared insolvent and a receiver appointed. That receiver, under the advice of his counsel, Mr. Miller, commenced a suit on the law side of the United States circuit court for the western district of Pennsylvania, against the Union company, and the action was brought to trial at great expense, and the jury was charged and retired. Pending its deliberation, a compromise was agreed upon by which the Union company paid to the complainant $6,750, besides costs. No criticism is made upon this settlement. That sum was paid to Mr. Miller. Out of that he paid certain disbursements to experts, and for traveling and other expenses, and to local counsel in Pittsburgh, amounting to $1,152.20; charged for his own services in that suit, $2,100, making a total of $3,252.20; then charged for a balance due him for services in the previous equity suit of $2,500, making a total charge of $5,752.20. He then credited a retainer, paid by the receiver to him, $100; check received for expenses, $250; check received for costs, $200, deposited with the clerk; check of the Union Switch Company, in settlement of compromise, $6,750, making a total of $7,300, which, deducting his bill of $5,752.20, left a balance of $1,547.80, which he paid to the receiver.

The receiver found on the ledger of the Johnson company charges for money paid by that company for the expenses of the equity suit, amounting to $3,221.45, so that the $1,547.80 received by the receiver left the suit still in debt to the Johnson company about $1,675.

Mr. Bezer's exceptions to this report may be summarized thus—*first*, that the charges of Mr. Miller are too great; *second*, that the $2,500 charge relates to the equity suit, and that by the terms of the contract the Johnson company was not entitled to retain out of the recovery in the action at law the costs of the suit in equity because it failed therein, and further, that Miller had received a promissory note of the Johnson company, secured by a chattel mortgage, for the balance of $2,500 due him for services in the equity suit, and had thereby waived his solicitor's lien, and also that there are no vouchers produced by the receiver

for the items charged on the ledger of the Johnson Signal Company; *third,* that Mr. Miller has no right of lien for his services upon the fund actually recovered; *fourth,* that a part of the sum recovered represented royalties due for signals installed before the contract of December, 1889, which went wholly to Bezer, and the remaining part thereof represented royalties accruing subsequent to that date, which go to the Johnson Signal Company, and that the expenses of the recovery should be apportioned between these two funds.

With regard to the value of Mr. Miller's legal services, he was examined at length on the stand and stated in detail the work he had done, and I am satisfied that his charges were reasonable.

One of the officers of the company was called as a witness and proved that all the payments charged on its ledger were made upon vouchers made out in due form and audited by the proper auditing officer of the company, and that each entry in the ledger was supported by such a voucher, most of which could not be found by the receiver. In addition, some of the payments were sustained by the direct evidence of Mr. Miller. So that I think those payments by the Signal company, amounting to the sum just mentioned, are sustained by proper proofs.

With regard to the question whether or not the Johnson company may not charge against the fund recovered in the suit at law the costs of the suit in equity, it is to be observed that the contract on the part of the Johnson Signal Company was

"to well and truly prosecute the said claim against the Union Switch and Signal Company in particular, and any other claims which the said The Johnson Railroad Signal Company may conclude to be just and collectible, and to bear the entire cost and expense of such prosecution or prosecutions, and suit or suits."

Then comes the clause which presents the difficulty:

"And it further agrees to render a true and correct account of any and all moneys collected or received in any such suit or proceeding, and out of the proceeds thereof to pay, first, the actual costs, expenses, attorney's and counsel's fees incurred, which are not or may not be taxable or collected from the defendant in any such suit or proceeding, and after deducting all such neces-

sary and proper expenses of any such suit or proceeding to pay over to the said Henry Bezer, as the attorney of the said Cheeswright, the remaining or net proceeds of the sums collected."

The contention is that the Johnson company could, under this language, charge Bezer with such costs only as it might incur in successful suits, and must itself bear the costs of unsuccessful suits.   I am not sure that such construction is sound.   But admitting its soundness, I think it does not exclude the costs in the equity suit.

It is manifest that the matter principally in the minds of the contracting parties was the claim against the Union Switch and Signal Company, and that the Johnson company was bound by its contract to prosecute that claim.   It did prosecute it under the advice of competent counsel, and succeeded in the court of first instance, before two judges of high standing.   Its counsel chose a bill in equity, and his choice was approved, but because the court above, on appeal, consisting of three judges, thought that an action at law was the proper remedy, it is now contended that the whole of the costs of the suit in equity should be borne by the Johnson company.

It is to be observed, in dealing with this contention, that while that suit produced no direct money results and ended in a dismissal of the bill, it did serve to develop the precise claim of the Union company and defined the precise limit and scope of the Yeomans license; and further, it compelled the Union company to discover, and it did discover, the number of signals installed by it up to a certain date, giving to the Johnson company information which neither it nor Mr. Bezer had been able theretofore to obtain, and which was of great value to it in the subsequent suit.   In fact, in this respect it served the purpose of a bill of discovery in aid of an action at law.   Under such circumstances, it seems to me that it would be a most stringent and inequitable construction to put upon the contract in question to say that under it the Johnson company must bear the expense of the equity suit.   The whole proceeding was, in substance, a single suit, and it was clearly the intention of the parties that the expenses of prosecuting the claim against the Union company should be borne by the proceeds of such prosecution.

Besides, it is manifest that the contract arising out of the three separate papers—namely, the assignment of the patents and the claims against the Union company, the license to the Johnson company, reserving a royalty of £3 per signal, and the contract on the part of the Johnson company to prosecute the Union company—was made on the basis that, by the true construction of the power previously given by Cheeswright to Yeomans, the latter could not grant or assign any permanent right to manufacture and use the Sykes signal. Evidently, both parties so believed. In this they were sustained by the court below but not in the court above. So it appears that they labored under a mutual mistake. It does not appear that the Johnson company or its counsel was responsible for this error more than Bezer and his counsel. It appears that he had independent counsel. And it was supposed on all hands that a recovery would be had against the Union company, either for the actual profits which they had made or upon the basis of the royalty of £4 for each signal installed up to the time of the transfer to the Johnson company and the revocation of the power to Yeomans, or partly on one ground and partly on the other ground. This is plainly indicated by the language of the agreement, which recites that Cheeswright claims that the Union company "is indebted or liable to him *either* for royalties for the use of the said inventions, &c., or for *damages* for the infringement," &c. Upon the basis of the construction so put by both parties upon the power given to Yeomans, the bill in equity filed by Mr. Miller was the proper remedy, and Mr. Bezer is quite as much responsible for its adoption as the Johnson company, and in point of fact the evidence shows that he personally, and presumably his counsel, approved it. Under these circumstances it would be in the highest degree inequitable to apply the literal construction of the contract with respect to the allowance for costs and charges claimed by Bezer, if it be capable of such construction.

The next point taken is that as to a large portion of the recovery in the successful suit, it was prosecuted for the benefit of the Johnson company alone, and therefore the cost of prosecution should be divided between the parties in proportion to the

amount that each was interested in it. This result is arrived at by separating so much of the recovery as covered royalties accruing prior to the assignment of the patents to the Johnson company from those accruing subsequent thereto, and contending that in so far as the latter class is concerned, the suit was brought by the Johnson company for its own benefit. But Bezer at the same time claims that he is entitled to three-fourths of the latter part of the recovery, and I think that probably he is right in that contention, upon equitable principles. It is true that the Johnson company's contractual liability to pay a royalty of £3 per signal is confined to such signals as it installed, and, by the strict terms of the writing, the recovery from the Union company of royalties for signals installed by it after the Johnson company's right accrued would belong to that company absolutely. But I think that Bezer is probably right in claiming that an equity arises in his favor out of the mutual mistake before referred to, to £3 for each signal out of the latter part of the recovery. That being so, then the whole recovery (less £1 per signal installed by the Union company after the Johnson company's right accrued) would belong to Bezer. And this is, in point of fact, the precise claim made by him at the hearing. That being so, it is manifestly unjust for him to claim any part of the recovery for royalties due from the Union company for signals installed after the date of the transfer of the patents to the Johnson company, without assuming the burden of the cost of such recovery. His claim being based entirely upon equitable considerations, it is plainly subject to the maxim "He who asks equity must do equity."

The contention that Mr. Miller was not entitled to retain $2,500 due him for services in the equity suit, because he had taken a promissory note of the company with a chattel mortgage security for it, cannot prevail. In the first place, it appears by his evidence that when he took the note he receipted for it conditionally—to be in full payment when paid. In the second place, the security was declared void by the court of chancery, as reported in *Savage* v. *Miller, 11 Dick. Ch. Rep. 432,* and that part of the decree was affirmed by the court of appeals, as reported

in *Savage* v. *Miller, supra;* and Mr. Miller swore that he had in his possession the promissory note ready to be delivered up. Under these circumstances the cases are clear that his so-called lien was not lost. *Stevenson* v. *Blakelock, 1 Mau. & Sel. 535,* and *Davies* v. *Lowndes, 3 Man., G. & S. 808* (at *p. 824*).

But there is another view to be taken of this case, which seems to me to be a complete answer to all the exceptions except that as to the value of Mr. Miller's services, and that is this—that Mr. Miller, while nominally in the employ of the Johnson company and rightfully looking to it for his compensation, was in reality working for Mr. Bezer, and the whole prosecution was really for Mr. Bezer's benefit; and when he came into possession of the fund which was the result of his labors, his right therein did not depend alone upon the question of an attorney's lien upon the papers in his hands, and it appears that he did retain all the papers in the case in his hands after the appointment of the receiver, but it depended upon his right to retain, or, as it is sometimes expressed, "defalk," the value of his services out of the fund; and this right would extend to the services rendered in good faith in the prosecution of the equity suit, for the simple reason that that suit was prosecuted for the benefit of Mr. Bezer, who was the real client, and in equity a debtor to Mr. Miller for services rendered therein in good faith.

I will advise that the exceptions be overruled, with costs; and as the items making up the ledger charge of $3,221.45 were disputed and supported by evidence, far enough at least to cover the $1,547.80 received by the receiver from Mr. Miller, I think the receiver is entitled to an order that the $1,547.80 received from Mr. Miller belongs to the general fund, to be distributed among the general creditors.

I deem it proper to add that the procedure adopted by Mr. Bezer and acquiesced in by the counsel of the receiver seems to me of doubtful propriety. Mr. Bezer was informed, before he filed his petition, that Mr. Miller had paid over to the receiver, as the net proceeds of the suit, only the sum of $1,547.80, and that he was ready to account for that sum. In the absence of collusion between the receiver and Mr. Miller, of which there is

no proof, that was all that the receiver could be charged with. Nor was he bound, under the circumstances, on the mere request of Mr. Bezer, to bring an action against Mr. Miller to recover any greater sum from him. The proper practice, as it seems to me, would have been for Mr. Bezer to apply to the court for an order on the receiver to sue Mr. Miller to recover the moneys withheld by him, and upon a proper showing such order would have been made upon terms that the receiver be indemnified in the premises. But as both parties have been fully heard upon the merits of the case, I think that the result should be held, in this court at least, to be binding upon each.